THE STATE OF WASHINGTON, *on the Relation of Washington Motor Coach Company, Plaintiff,* v. E. PAT KELLY, *as the Director of the Department of Labor and Industries, Respondent.*

THE STATE OF WASHINGTON, *on the Relation of Grays Harbor Lines, Inc., Plaintiff,* v. E. PAT KELLY, *as the Director of the Department of Labor and Industries, Respondent.*[1]

[1]Reported in 74 P. (2d) 16.

*Neal, Brodie & Trullinger,* for relators.

*The Attorney General* and *Browder Brown, Assistant,* for respondent.

GERAGHTY, J.—These cases, consolidated for trial, are original applications in this court for mandamus to compel the director of labor and industries to accept from the relators premiums on account of certain of their employees claimed to be covered by the provisions of the state workmen's compensation act.

It is alleged in the affidavits supporting the applications that the operations of certain of the relators' bus lines are conducted wholly within the state, but that these stages carry passengers destined to and from points outside the state and also honor tickets held by passengers from without the state; other of their stages operate across state lines and carry both intrastate and interstate passengers.

It is further alleged that, whatever may be the extent to which any of their lines are engaged in intrastate and interstate commerce, their operations within the state and the payrolls of their employees may be segregated for the purpose of determining the premiums payable to the department on account of intrastate operations; that, for several years prior to January 1, 1937, the relators have paid, and the department has accepted, premiums upon their employees

engaged in that part of their business segregative as intrastate.

By the terms of chapter 211 of the 1937 Session Laws, p. 1028 (Rem. Rev. Stat. (Sup.), § 7674 *et seq.*), stage drivers are specifically classified as engaged in extrahazardous employment, and the relators allege that their tenders to the department of the premiums payable by them under this law were refused, and that they and their employees are denied the protection of the compensation act. In declining to accept the tendered premiums, the department, in May, 1937, addressed a letter to the Washington Motor Coach Company, in which it is said:

"We are advised by the Attorney General of the State of Washington that the nature of the present operations of the Washington Motor Coach Company detailed by you in your letter of May 16, 1937 to the Department, including the stage drivers, auto mechanics, stock clerks, and conductorettes, constitute interstate commerce operations of such a character that they can not be embraced within the provisions of the Workmen's Compensation Act by Elective Adoption or otherwise.

"We are of the further opinion that these operations as detailed by you in your letter of May 15, 1937, are of such interstate character as to preclude the application to them of Chapter 211 of the Laws of 1937 when that Act becomes effective on June 10, 1937."

Supplementing this letter, the department, on June 22, 1937, wrote the motor coach company as follows:

"Supplementing our letter of May 18, 1937, addressed to your firm with reference to the operations of the Washington Motor Coach Company, Inc., we wish to advise that it is the opinion of this department that your firm, due to the nature and character of the operations being conducted, i. e., engaged in interstate commerce and in intrastate and interstate commerce making it impossible to segregate for the purpose of

premium compensation due the department as required by section 7695 Remington's Revised Statutes, will not be affected by the application of Chapter 211 of the Laws of 1937. Chapter 211 of the Laws of 1937 will apply only to those firms whose operations are purely of an intrastate character having no relation whatsoever with interstate commerce."

The premiums and assessments tendered by the relator Grays Harbor Lines were refused for the reasons assigned in the letters addressed to the motor coach company. The respondent, director of department of labor and industries, in his answer, admitted the refusal to accept premiums from the relators, admitted the extent and character of their operations and the transportation of passengers and express, but denied that it was possible to make segregation of the payrolls of relators' employees in respect of their employment in intrastate and interstate commerce.

The answer affirmatively pleads the enactment by Congress of the motor carrier act of 1935, which, it is alleged, embraces a complete system of regulation of motor transportation in interstate commerce to the exclusion of any authority in the state to legislate upon any phase of the subject.

The question of the court's jurisdiction to entertain these applications was not raised at the departmental hearing. At the hearing *En Banc*, on the suggestion of the court, counsel presented their views on the question. Counsel for respondent contended that the recent case of *State ex rel. Winningham v. Olinger*, 190 Wash. 697, 70 P. (2d) 317, is decisive against our jurisdiction.

In that case, medical aid contracts had been submitted to Jay Olinger, as supervisor of industrial insurance, for his approval, in accordance with the procedure provided in the workmen's compensation act. The supervisor returned them to the employers with-

out his approval, assigning as reasons therefor that they were written to cover a three-year period and he would approve contracts for one year only; he also objected to the compensation schedule contained in the contracts. No question of the jurisdiction of the department of labor and industries in the matter was involved there, nor of the right of the employers to have proper contracts approved. The question was merely whether the supervisor was warranted, under the law, in refusing to perform an act more or less ministerial.

We held that, before applying to the courts, the employers should first have appealed to the joint board from the supervisor's ruling. In the present case, the department definitely denied the right of relators and their employees to the protection and benefits of the compensation act. They could not apply to the joint board, the departmental tribunal, for relief, since entry to the department was denied to them. This action of the department raised a preliminary question of law for decision by the court.

In *State ex rel. Loney v. Industrial Accident Board,* 87 Mont. 191, 286 Pac. 408, a workman was injured while in the employ of a contractor performing work in Glacier National Park. On the advice of the attorney general, the industrial accident board of Montana dismissed a claim for compensation on the ground that it was without jurisdiction. On application for a writ of mandamus to require the department to assume jurisdiction, the court said:

"The board erred in not retaining jurisdiction of the application and hearing the case upon the merits. The denial of jurisdiction by the board raises a preliminary question of law, and mandamus is the proper remedy to compel the board to act. (*Raleigh v. District Court,* 24 Mont. 306, 81 Am. St. Rep. 431, 61 Pac. 991; *State ex rel. Arthurs v. Board of County Com-*

*missioners,* 44 Mont. 51, 118 Pac. 804; *State ex rel. Payne v. District Court,* 53 Mont. 350, 165 Pac. 294.)"

See, also, *Shugg v. Anaconda Copper Mining Co.,* 100 Mont. 159, 46 P. (2d) 435, 439.

Indeed, the relators have, in the present applications, followed the procedure suggested in *Long v. Thompson,* 177 Wash. 296, 31 P. (2d) 908. There, the plaintiff, who was employed by a contractor on work for the United States government, sued to recover damages for personal injuries sustained while so employed, and recovered judgment. The contractor had set up, as an affirmative defense, the fact that he had made application to the department to place his employees under the workmen's compensation act, and that his application was rejected. Holding the employer liable for failure to comply with the provisions of the act, the court said:

"Their failure cannot be excused on the ground that tender of the estimated payroll and premiums would have been unavailing. It was the duty, prescribed by statute, of the director of labor and industries to accept the estimated payroll and premiums. And that duty could have been compelled by mandamus. . . .

"Having failed to comply with the obligations imposed upon them by the workmen's compensation act, appellants subjected themselves to this action."

The applications for the writs are properly before us.

On the merits, the contentions of the relators are: First, that, in the absence of any legislation by Congress regulating the liability of interstate motor carriers to their employees, the state may legislate upon the subject; and secondly, that, even though the state may be precluded from legislating upon the subject of interstate motor transportation, it may be possible to segregate intrastate operations for the purpose of determining the premium payments chargeable to intrastate operations.

The respondent, director of department of labor and industries, contends, in the first place, that the Federal motor transportation act of 1935 amounts to a pre-emption of the whole field of interstate commerce by motor transportation to the exclusion of any right in the state to legislate upon any phase of the subject; and he seems to contend, also, that, in any event, the relators are excluded from the provisions of the compensation act by § 3 of chapter 67 of the 1919 Session Laws, p. 136 (Rem. Rev. Stat., § 7695 [P. C. § 3486b]).

■ The authorities support the view that the state may legislate on a subject affecting interstate commerce only incidentally, in the absence of congressional legislation on the subject. The rule is stated in 28 R. C. L. 726, § 21, as follows:

"The power of Congress to regulate commerce among the several states is supreme and plenary under the constitution. The reservation to the states to legislate on questions affecting interstate commerce is only of such authority as is consistent with and not opposed to the grant of Congress, a grant which extends to every instrumentality or agency by which interstate commerce may be carried on. No state may impose a direct burden on interstate commerce; but within certain limitations there remains to the states, until Congress acts, a wide range for the exercise of the power appropriate to territorial jurisdiction although interstate commerce may be affected. Granting that a state compensation act, in its application to employers who are engaged in interstate commerce, does in fact touch and affect such commerce, every reason would seem to be in favor of sustaining its validity and efficacy, provided only that no federal enactment shall have already occupied the same field of legislation. Accordingly, an employment in interstate carriage by motor vehicle might properly be held to be within the scope and operation of a state statute."

In *Gilvary v. Cuyahoga Valley R. Co.*, 292 U. S. 57, 54 S. Ct. 573, it is said:

"Unless excluded by congressional enactment under the commerce clause, state law governs the respective liabilities and rights of railroad carriers and their employees growing out of injuries suffered by the latter whether in interstate or intrastate commerce. *Second Employers' Liability Cases*, 223 U. S. 1, 54. The power conferred upon the Congress is such that when exerted it excludes and supersedes state legislation in respect of the same matter. But Congress may so circumscribe its regulation as to leave a part of the subject open to state action. *Atlantic Coast Line v. Georgia*, 234 U. S. 280, 290. Cf. *Napier v. Atlantic Coast Line*, 272 U. S. 605. The purpose exclusively to regulate need not be specifically declared. *New York Central R. Co. v. Winfield*, 244 U. S. 147. But, ordinarily such intention will not be implied unless, when fairly interpreted, the federal measure is plainly inconsistent with state regulation of the same matter. *Illinois Cent. R. Co. v. Public Utilities Comm'n*, 245 U. S. 493, 510."

*Hall v. Industrial Commission of Ohio*, 131 Ohio St. 416, 3 N. E. (2d) 367, involved the right of an employee of a stage company to recover compensation under the workmen's compensation law of Ohio for an injury sustained outside the state while engaged in interstate motor transportation. As preliminary to a decision on the employee's right to recover, in any event, under the Ohio statute, for an injury sustained outside the state, the court considered the basic right of the state to make its compensation act applicable to employers and employees engaged in interstate commerce. On this issue, the court said:

"The consensus of authority seems to be that a state may provide compensation to one engaged in interstate commerce so long as the Congress of the United States, acting under its constitutional power to regulate commerce among the states, has not preempted

the field. *Lindstrom v. Mutal Steamship Co.*, 132 Minn., 328, 156 N. W., 669, L. R. A. 1916D, 935; *Staley v. Ill. Cent. Rd. Co.*, 268 Ill., 356, 109 N. E., 342, L. R. A. 1916A, 450, and an annotation; *Klettke v. C. & J. Commercial Drive Away*, 250 Mich., 454, 231 N. W., 132; *In Matter of Claim of Tallman v. Colonial Air Transport, Inc.*, 259 N. Y., 512, 182 N. E., 159; 28 Ruling Case Law, 728, Section 24; 71 Corpus Juris, 316, Section 49."

The policy of Congress in the enactment of the motor transportation act of 1935 is stated in the following language:

"Sec. 202 (a) It is hereby declared to be the policy of Congress to regulate transportation by motor carriers in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the public interest; promote adequate, economical, and efficient service by motor carriers, and reasonable charges therefor, without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices; improve the relations between, and coordinate transportation by and regulation of, motor carriers and other carriers; develop and preserve a highway transportation system properly adapted to the needs of the commerce of the United States and of the national defense; and cooperate with the several States and the duly authorized officials thereof and with any organization of motor carriers in the administration and enforcement of this part.

"(b) The provisions of this part apply to the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce and to the procurement of and the provision of facilities for such transportation, and the regulation of such transportation, and of the procurement thereof, and the provision of facilities therefor, is hereby vested in the Interstate Commerce Commission.

"(c) Nothing in this part shall be construed to affect the powers of taxation of the several States or to

authorize a motor carrier to do an intrastate business on the highways of any State, or to interfere with the exclusive exercise by each State of the power of regulation of intrastate commerce by motor carriers on the highways thereof." (49 Stat. 543, 49 U. S. C. A. (Sup.), 61, § 302.)

There is nothing in this declaration nor in the act itself remotely suggesting a purpose to regulate the liability of employers engaged in this type of interstate commerce to their employees.

Conceding power in the state, by reason of the nonaction of Congress, to enact a workmen's compensation act covering employees in interstate commerce, the next inquiry is whether the relators' employees are within the terms of the act.

The 1937 amendment, chapter 211, p. 1028, brought stage driving specifically within the coverage of the act. The respondent contends, however, that the application of this amendment is limited by force of the provisions of Rem. Rev. Stat., § 7695, to strictly intrastate operations. It is necessary to a proper understanding of the question to review somewhat in detail successive amendments to the original act.

Section 2 of the original compensation act, chapter 74 of the Laws of 1911, p. 346, enumerated certain employments specifically characterized as extrahazardous. There were included in this enumeration certain operations that might enter into interstate commerce: Telegraph, telephone, electric light or power plants or lines, steamboats, tugs, ferries, and railroads. Motor bus transportation was not, of course, included, because it did not exist. Recognizing that some of the employments classified as extrahazardous might involve interstate commerce and that, in so far as the liability of employers engaged in interstate commerce to their employees was covered by congressional legislation, it

would be beyond the power of the state to legislate in the premises, § 18, p. 367, of the act provided in part:

"The provisions of this act shall apply to employers and workmen engaged in intrastate and also in interstate or foreign commerce, for whom a rule of liability or method of compensation has been or may be established by the Congress of the United States, only to the extent that their mutual connection with intrastate work may and shall be clearly separable and distinguishable from interstate or foreign commerce, . . ."

In point of fact, the only employers engaged in interstate commerce whose liability to their employees had, up to that time, been regulated by Congress were the railways. Congress, in 1908, had passed the Federal employers' liability act, establishing the liability of common carriers by railroad in interstate and foreign commerce for injuries to employees from negligence. 45 U. S. C. A. 92, § 51 *et seq.* At the 1917 session, the state legislature amended § 18, p. 367, of the original 1911 act, limiting its application wholly to railroads, as follows:

"Inasmuch as it has proved impossible in the case of employe[e]s engaged in maintenance and operation of railways doing interstate, foreign and intrastate commerce, and in maintenance and construction of their equipment, to separate and distinguish the connection of such employe[e]s with interests or foreign commerce from their connection with intrastate commerce, and such employe[e]s have, in fact, received no compensation under this act, the provisions of this act shall not apply to work performed in the maintenance and operation of such railroads or performed in the maintenance or construction of their equipment, or to the employe[e]s engaged therein, but nothing herein shall be construed as excluding from the operation of this act railroad construction work, or the employe[e]s engaged thereon: *Provided, however,* That common carriers by railroad engaged in such interstate or foreign

commerce and in intrastate commerce shall, in all cases where liability does not exist under the laws of the United States, be liable in damages to any person suffering injury while employed by such carrier, or in case of the death of such employe[e] to his surviving wife and child, or children, and if no surviving wife or child or children, then to the parents, sisters, or minor brothers, residents of the United States at the time of such death and who were dependent upon such deceased for support, to the same extent and subject to the same limitations as the liability now existing, or hereafter created, by the laws of the United States governing recoveries by railroad employe[e]s injured while engaged in interstate commerce."  Chapter 28, Laws of 1917, § 19, p. 96.

This section, with some later amendments not material here, is now Rem. Rev. Stat., § 7693 [P. C. § 3486].

Comparing this revised section with § 18 as it appeared in the 1911 act, it will be observed that the amended section left out any reference to employees other than those of railways engaged in interstate commerce.  This did not mean that employees engaged in interstate commerce other than railways were left out of the protection of the compensation act; they remained under the act, in so far as classified, in § 2. However, to meet the possibility that employers of labor in interstate commerce other than railways might thereafter have their liability to their employees regulated by Congress, the legislature, at the 1919 session, chapter 67, p. 134, enacted a new section to be known as § 6604-18b (now carried as Rem. Rev. Stat., § 7695). The new section embodied the first part of § 18 of the original 1911 act, and, with new matter italicized, follows:

"The provisions of this act shall apply to employers and workmen (other than railways and their workmen) engaged in intrastate and also in interstate or

foreign commerce, for whom a rule of liability or method of compensation now exists under or may *hereafter* be established by the congress of the United States, only to the extent that the payroll of such workmen may and shall be clearly separable and distinguishable from the payroll of workmen engaged in interstate or foreign commerce: *Provided, That as to workmen whose payroll is not so clearly separable and distinguishable, the employer shall in all cases be liable in damages for injuries to the same extent and under the same circumstances as is specified in the case of railroads in the first proviso of section 6604-18* [Rem. Rev. Stat., § 7693]."

*State v. Postal Telegraph-Cable Co.,* 101 Wash. 630, 172 Pac. 902, was an action brought by the state to recover payroll premiums alleged to be due from the telegraph company for the years 1911 and 1912 under the original workmen's compensation act. The claim for premiums was made on account of employees engaged in certain construction work, as well as those engaged in the telegraphic operations of the company. The court held that, while the employees engaged in sending and receiving messages and operating the telegraph system were engaged in interstate commerce, it was plain that the other class of workmen employed in construction work were not so engaged, and the telegraph company was liable for premiums on their payroll. As to employees admittedly in interstate commerce, the court expressed the opinion that the compensation act did not apply to them, citing § 18 of the original act quoted above. Quoting this section, the court said:

"The employees who are engaged in operating the telegraph lines and in handling interstate and intrastate messages are, no doubt, engaged in interstate commerce. It is clear that the Congress of the United States may establish a rule of liability and a method of compensation for such employees. This act, therefore, by its terms, applies to such persons only to the

extent of their mutual connection with intrastate work, which shall be clearly separable and distinguishable from interstate or foreign commerce. Under the allegation of the answer, this work is not clearly separable and distinguishable as to those employees. If this is true, the act does not apply."

The relators contend with great earnestness, and we think with much justice, that the court misconstrued the import of the language employed in § 18.

This decision was rendered in April, 1918. At this time, as we have seen, § 18, as quoted, had been superseded by the 1917 legislation and was not re-enacted until the 1919 session. However, it was proper for the court to refer to it in its original form, because the liability sued on was alleged to have accrued while it was effective.

As we have seen, § 2 of the 1911 act brought within its purview several classes of employers who might be engaged in interstate commerce. They remained under the act unless expressly excluded by some of its succeeding provisions. Section 18 did not exclude the employees of telegraph companies engaged in interstate commerce, because there was then in existence no congressional legislation establishing a rule of liability or a method of compensation for them. The interstate employees excepted from the operation of the section were those only

" . . . *for whom a rule of liability or method of compensation has been or may be established by the Congress of the United States"*; (Italics ours.)

and as to them

" . . . only to the extent that their mutual connection with intrastate work may and shall be clearly separable and distinguishable from interstate or foreign commerce, . . ."

At that time, the only group that came within the provisions of § 18 was railway employees, because they

were the only ones for whom congressional provision had been made. This view is made certain by the enactment of § 7695, quoted above, by the 1919 legislature. It will be observed that in this section the word "hereafter," not in the original § 18, is inserted after the word "may," so that, while the original law read: "for whom a rule of liability or method of compensation has been or may be established by the Congress," the new section reads: "for whom a rule of liability or method of compensation now exists under or *may hereafter* be established by the congress," thus showing that the legislature intended the actual exercise of the power by Congress rather than its potential possession.

In *Hall v. Industrial Commission of Ohio,* 131 Ohio St. 416, 3 N. E. (2d) 367, already cited, the court, in passing on a provision of the workmen's compensation law of the state of Ohio, in identical language with that of our own statute construed in *State v. Postal Telegraph-Cable Co., supra,* said:

"An examination of that section discloses that it applies only to employers and employees for whom 'a rule of liability or method of compensation has been or may be established by the Congress of the United States.' The words 'may be established' plainly refer to federal legislation that should thereafter be enacted. As Congress had not acted with reference to employers and employees engaged in interstate commerce in the operation of bus lines, up to the time of the claimant's injury, the statute has no application to the case here."

A large and growing industry is seeking protection for its employees under the workmen's compensation act. The last legislature accorded that protection by specifically including bus drivers in the schedule of extrahazardous employments. If this relief is denied them, the employees of the industry will be remitted to the common law, which is characterized in the first

section of the compensation act as inconsistent with modern industrial conditions and in practice economically unwise and unfair. The act of the 1919 legislature (Rem. Rev. Stat., § 7695) removed whatever basis there was for our construction of the earlier law in *State v. Postal Telegraph-Cable Co., supra.*

Our conclusion is that the employees of the relators engaged in motor transportation, whether their operations be intrastate or interstate, are covered by the provisions of the 1937 Session Laws.

Let the writs issue.

ALL CONCUR.

